*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

JEFFREY CRAIG ZEIGLER,

       Defendant-Appellant.

UNPUBLISHED
July 2, 2020

No. 346811
Oakland Circuit Court
LC No. 2018-267052-FC

Before: STEPHENS, P.J., and O'BRIEN and REDFORD, JJ.

PER CURIAM.

Defendant was charged with assault with intent to commit murder (AWIM), MCL 750.83, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Following a jury trial, he was acquitted of AWIM, but convicted of the lesser offense of assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84, and felony-firearm. The trial court sentenced defendant to 2 to 10 years' imprisonment for the AWIGBH conviction, and a consecutive two-year term of imprisonment for the felony-firearm conviction. We affirm defendant's convictions, but remand for further proceedings regarding defendant's sentence for the AWIGBH conviction.

## I. FACTS

Defendant's convictions arise from events that occurred on the morning of April 12, 2018. On that day, the 14-year-old complainant overslept and missed the bus. Because his mother was at work and had taken away his cell phone the night before, the complainant decided to walk to school, which was several miles away. The complainant planned to follow his bus route, but became lost in a particularly confusing subdivision. Eventually, the complainant stopped at defendant's house to ask for directions. The complainant approached defendant's house, rang the doorbell, and then and knocked on the front door. Defendant's wife came downstairs to answer the door, and upon confronting the complainant, she yelled for defendant because she thought the complainant was trying to break into the house. After hearing his wife scream, defendant retrieved his shotgun and headed towards his front door. When the complainant saw the gun, he started running away from the house. Defendant emerged from the house, aimed the shotgun toward the

complainant as he was running away, and eventually discharged the gun. Fortunately, no one was physically injured when the gun discharged. Defendant offered several explanations for his actions, including that the shotgun discharged accidentally and that, fearing for his safety, he fired a warning shot into the air to scare the complainant.

The incident was captured on video by a home surveillance camera at defendant's house. The video was played for the jury at trial. The video shows the complainant, wearing a backpack, walk up to the front door of defendant's house and ring the doorbell. After waiting a few seconds, the complainant opens the screen door and knocks on the main door. The complainant appears to be speaking to someone inside the house and then releases the screen door and backs away while gesturing with his left hand, as if pointing behind him. He then steps farther back on the porch and puts his hands down at his side. The complainant then backs off the porch, turns to his left, and starts running. At the same time, a shirtless defendant emerges from the house and looks in the complainant's direction while holding a shotgun.

The video shows defendant raising the shotgun to chest height, and he appears to aim the gun in the complainant's direction. Defendant's upper body moves slightly, as though preparing for the gun to recoil. Defendant admitted at trial that, at this point, he pulled the trigger but the safety was on. In the video, defendant briefly glances down at the shotgun while keeping it raised, then fires. Defendant admitted at trial that he "[tried] to shoot the gun, [found] that the safety was on, turn[ed] off the safety, and then [shot]." These events—from the time that defendant is seen walking onto his porch until he discharges the gun—took place in a matter of seconds. In the video, after the gun is discharged, defendant can be seen lowering the gun to his waist while continuing to look in the direction in which the complainant fled, before eventually dropping the gun to his side and walking back into his house.

The jury acquitted defendant of AWIM, but convicted him of the lesser offense of AWIGBH and felony-firearm. Defendant now appeals, challenging both his convictions and his sentence for AWIGBH.

## II. PROSECUTORIAL MISCONDUCT

Defendant first argues that his trial was tainted by the prosecutor's misconduct during direct examination of a detective who interviewed defendant on the morning of the shooting incident. Defendant admits that while being interrogated by the detective, he referred to the complainant, one time, as the "colored kid." However, he asserts that the prosecutor improperly aroused the jurors' prejudices by questioning the detective in a manner that required the witness to repeatedly reference defendant's isolated racial slur. We disagree.

Defendant did not object to the prosecutor's examination of the detective at trial, so this issue is unpreserved. *People v Cox*, 268 Mich App 440, 451; 709 NW2d 152 (2005). We review unpreserved claims of prosecutorial misconduct[1] for plain error affecting substantial rights. *Id.*

The test for prosecutorial misconduct is whether the defendant was denied a fair trial. *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id*. at 64. In *People v Bahoda,* 448 Mich 261, 266; 531 NW2d 659 (1995), our Supreme Court emphasized that it abhorred "the injection of racial or ethnic remarks into any trial because it may arouse the prejudice of the jurors against a defendant, and hence, lead to a decision based on prejudice rather than on the guilt or innocence of the accused." Accordingly, the Court noted that it would not hesitate "to reverse where potentially inflammatory references are intentionally injected, with no apparent justification except to arouse prejudice. *Id.*

During the detective's testimony, the prosecutor questioned him about what defendant disclosed during their interview. The first reference to defendant using the phrase "colored boy" or "colored kid" occurred in the following exchange:

> *Q*. [W]hat did [defendant] tell you about the about, you know, the beginning of his day?
>
> *A*. So, beginning of his day in which he told me during the interview was that he was awoken by a loud scream by his wife. He states that he heard this scream. He put on his pants. Didn't have an opportunity to put his shirt on. Started walking downstairs. As he was walking down stairs, he indicated to mean [sic] he seen a colored—a colored boy or kid outside of his door on the front porch, and felt that this colored boy was coming through his door.

After this exchange, the prosecutor continued to question the detective about defendant's statements and actions. When doing so, the prosecutor referred to the complainant only as "person" or "guy," but the detective, in response to the prosecutor's questions, continued to employ the phrase "colored boy" or "colored kid":

> *Q*. Now, I know that you mentioned that he told you that his—he awoke to his wife, you know, screaming, and—and he came down the stairs. In his assessment to you, though did he express to you that he was acting completely off of what his wife was saying and doing or did he tell you that he assessed that this person was coming in the house?

---

[1] This Court explained in *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015), that a fairer label for most claims of prosecutorial misconduct would be "prosecutorial error," while only the most extreme cases rise to the level of "prosecutorial misconduct." However, we will use the phrase "prosecutorial misconduct" because it has become a term of art.

*A.* He had—he had expressed to me that when he was coming down the stairs, he seen the colored boy coming through what he felt was coming through his door, assessing him as breaking into his home.

&ast; &ast; &ast;

*Q.* Okay, and do you remember his expression about as he was getting the gun or as he was going to get his shotgun, what his thought was about this guy breaking in?

*A.* He had indicated to me that he perceived the colored boy as a threat.

The prosecutor's direct examination concluded with no other mention of the objectionable phrases.

On cross-examination, however, defendant's counsel questioned the detective extensively on defendant's use of the objectionable phrase, using the terms "colored boy" and "colored kid" several times. Ultimately, through counsel's cross-examination, the detective waffled about how many times defendant actually used the phrase "colored boy" or "colored kid," until the detective admitted that he did know which description was actually used, and then finally acknowledged that it was "colored kid." He also admitted that he was incorrect when he testified on direct examination that defendant referred to the complainant as "colored boy." The detective then admitted that he never documented in his report that defendant referred to the complainant as "colored kid," and further acknowledged that he had only revealed defendant's use of the phrase for the first time at trial.

After defendant's cross-examination, the prosecutor, for the first time, used the phrase "colored kid" when she asked the detective on redirect if the phrase had ever come out of defendant's mouth. The detective simply replied, "Yes, it did." Later in the trial, the parties stipulated that during defendant's interview, defendant stated, "I threw on my pants, and I ran downstairs and there was a colored kid on the front porch, and it appeared he was trying to get in." The stipulation included the parties' agreement that defendant said "colored kid" only one time and never said "colored boy."

Viewing the challenged questions and responses in context, it is apparent that the prosecutor did not deliberately elicit improper testimony. During the prosecutor's direct examination, the prosecutor did not use the objectionable phrases and she never intentionally asked questions that compelled the witness to invoke the phase in order to fully respond to the prosecutor's question. Moreover, the prosecutor did not dwell on this area, and there were only three questions that resulted in the detective reiterating the fact that defendant used the racial term. Prosecutorial misconduct is not present unless there is a "studied purpose to arouse the prejudice of the jury." *Bahoda,* 448 Mich at 271. Such a showing has not been made in this case. Instead, the prosecutor's questions were directed at eliciting relevant information regarding defendant's actions and intentions, not to provoke the detective to repeat the racial remark. A defendant may not base a claim for prosecutorial misconduct on a prosecutor's good-faith attempt to admit evidence. *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999); *Dobek*, 274 Mich App 70. The record does not support defendant's assertion that the prosecutor deliberately intended to prejudice defendant by inserting race or racial bias into the trial. Thus, after reviewing the record,

we are satisfied that the prosecutor did not commit prosecutorial misconduct in the manner alleged by defendant.

## III. FORM OF THE VERDICT

Next, defendant argues that the jury verdict form was defective because it did not give the jury the option to return a general verdict of not guilty. We disagree.

An issue with a jury verdict form is considered an error in jury instructions. *People v Garcia*, 448 Mich 442, 483-484; 531 NW2d 683 (1995). Preliminarily, we note that defendant did not object to the jury verdict form and expressed satisfaction with the court's jury instructions and explanation of the verdict form. Therefore, this issue could be considered waived. See *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011). But because defendant also argues that counsel was ineffective for not objecting to the verdict form, review of the issue is appropriate. To the extent that direct review of the issue regarding the verdict form is not waived, our review is for plain error affecting substantial rights. *Id.* at 505.

"[A] criminal defendant is deprived of his constitutional right to a jury trial when the jury is not given the opportunity to return a general verdict of not guilty." *People v Wade,* 283 Mich App 462, 467; 771 NW2d 447 (2009). A defendant bears the burden of establishing that the instructional error undermined the reliability of the verdict. *People v Hawthorne*, 474 Mich 174, 184; 713 NW2d 724 (2006). In this case, the verdict form provided:

> You may return only one verdict on each count. Mark only one box for each count on this sheet.
>
> **Count One:  Assault with Intent to Murder**
>
> __ Not Guilty
>
> __ Guilty of Assault with Intent to Murder
>
> __ Guilty of the Lesser offense of Assault with intent to do Great Bodily Harm

This verdict form provided the jury with three clear options for the AWIM count: (1) not guilty, (2) guilty of the charged offense of AWIM, or (3) guilty of the lesser offense of AWIGBH. Contrary to what defendant argues, this verdict form specifically provided the jury with the option of returning a general "not guilty" verdict as an alternative to *either* AWIM and AWIGBH.

We reject defendant's argument that the verdict form is similar to the verdict form that was deemed defective in *Wade,* 283 Mich App at 464. In that case, this Court found that the following verdict form was deficient:

-5-

POSSIBLE VERDICTS

YOU MAY RETURN ONLY ONE VERDICT FOR EACH COUNT.

COUNT 1-HOMICIDE-MURDER FIRST DEGREE-PREMEDITATED (EDWARD BROWDER, JR)

__ NOT GUILTY

__ GUILTY

OR

__ GUILTY OF THE LESSER OFFENSE OF-HOMICIDE-MURDER SECOND DEGREE (EDWARD BROWDER, JR.)

OR

__ GUILTY OF THE LESSER OFFENSE OF-INVOLUNTARY MANSLAUGHTER-FIREARM INTENTIONALLY AIMED (EDWARD BROWDER, JR.)

COUNT 2-WEAPONS-FELONY FIREARM

__ GUILTY

__ NOT GUILTY  [*Wade,* 283 Mich App at 465.]

The *Wade* Court concluded that, "despite the trial court's efforts to clarify the verdict form with its instructions, because of the way the verdict form was set up, the jury was not given the opportunity to find defendant either generally not guilty or not guilty of the lesser-included offenses such that his constitutional right to a trial by jury was violated." *Id.* at 468. In *Wade,* the placement of the word "or" suggested that if the jury decided to move on from the charged crime, it had no other alternative than to choose the guilty option for the lesser included offense. Comparing the verdict form in the present case to the one in *Wade,* it is clear that the defect in *Wade*'s verdict form in not present in this case. Unlike in *Wade*, defendant's verdict form did not limit or restrict a finding of "not guilty" to only one offense. The "not guilty" option is independent from the offenses, thereby indicating that the jury had the option to find defendant generally "not guilty" of the two listed offenses below. Defendant was not deprived of his right to have the jury presented with the opportunity to return a general verdict of not guilty.

Because the form of the verdict in this case was not defective, defendant's related ineffective-assistance claim cannot succeed because any objection would have been futile. See *People v Ericksen,* 288 Mich App 192, 201; 793 NW2d 120 (2010) (explaining that trial counsel's failure to raise a futile objection does not constitute ineffective assistance of counsel).

## IV. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the prosecution failed to present sufficient evidence of intent to support his conviction of AWIGBH.[2] We disagree.

This Court reviews de novo a challenge to the sufficiency of the evidence. *People v Lockett*, 295 Mich App 165, 180; 814 NW2d 295 (2012). The evidence must be viewed in the light most favorable to the prosecution to determine if any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012).

The elements of AWIGBH are "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016) (quotation marks and citation omitted). Defendant only challenges the intent element. "Assault with intent to commit great bodily harm is a specific intent crime." *People v Parcha,* 227 Mich App 236, 239; 575 NW2d 316 (1997). This Court has defined the intent to do great bodily harm as "an intent to do serious injury of an aggravated nature." *Blevins*, 314 Mich App at 357 (quotation marks and citation omitted). Because intent is difficult to prove, minimal circumstantial evidence is sufficient to demonstrate the required intent. *People v Stevens*, 306 Mich App 620, 629; 858 NW2d 98 (2014).

The record discloses that the prosecution presented ample evidence to allow a rational jury to conclude beyond a reasonable doubt that defendant intended to cause great bodily harm. "Intent to cause serious harm can be inferred from the defendant's actions, including the use of a dangerous weapon or the making of threats." *Id*. In this case, the evidence demonstrated that the 14-year-old complainant approached defendant's home because he was lost and required directions to the local high school. He did not display any threatening behavior, but defendant and his wife irrationally perceived him as a threat. Defendant retrieved a loaded shotgun and when the complainant saw that defendant was armed with a shotgun, he took off running. The complainant testified that when he turned to look back, he saw defendant pointing the shotgun at him, which compelled him to run even faster. Shortly thereafter, the complainant heard a gunshot.

Video from the porch's surveillance camera corroborated the complainant's version of the events. The video shows the complainant looking over his shoulder as he is running away from defendant's porch. At this point, defendant is looking in the complainant's direction while holding the shotgun, then raises the gun to chest height and appears to aim the gun. Defendant's upper body then slightly moves. At trial, a deputy testified that this movement is indicative of a person anticipating the recoil of firing a gun. Defendant admitted at trial that, when his body slightly moves, he indeed tried to pull the trigger, but the safety was on. He further admitted that, had the

---

[2] As part of this issue, defendant asserts that the trial court erred by denying his motion for a directed verdict. However, no such motion was ever raised by defendant. While our review of a challenge to the sufficiency of the evidence is largely similar to our review of a challenge to a trial court's decision on a motion for a directed verdict, see *People v Schultz*, 246 Mich App 695, 702; 635 NW2d 491 (2001), we limit our review in this case solely to whether the evidence was sufficient to support defendant's conviction.

safety not been on, it was a "distinct possibility" that he would have shot at the complainant. As the video continues, defendant can be seen glancing slightly down at the shotgun while keeping it raised, and then fires it. Defendant admitted at trial that he "[tried] to shoot the gun, [found] that the safety was on, turn[ed] off the safety, and then [shot]."

Evidence that defendant pointed the gun in the direction of the complainant and pulled the trigger, and then disengaged the safety and discharged the gun while it was still pointed in the direction of the complainant, was sufficient to enable the jury to find that defendant deliberately aimed and fired the gun at the complainant, intending to cause great bodily harm. The fact that the complainant was not struck or injured by the bullet did not preclude the jury from finding that defendant acted with the requisite intent. *People v Harrington*, 194 Mich App 424, 429-430; 487 NW2d 479 (1992).

We also note that defendant gave conflicting versions of the events surrounding the shooting in his statements before trial and his testimony at trial, which is relevant to the issue of intent. "[C]onflicting statements tend to show a consciousness of guilt." *People v Unger,* 278 Mich App 210, 225, 227; 749 NW2d 272 (2008). Defendant initially asserted that he had come out onto the porch, slipped, and then the shotgun accidentally discharged. He then claimed that when he opened the door in anticipation of the sheriff's department arriving in response to his wife's 911 call, the complainant turned and started walking back toward him, at which point defendant attempted to retreat to his home, and while doing so his gun accidentally discharged when he slipped on wet pavement. At trial, defendant admitted that he left his house with the intent to fire his weapon, but claimed that his goal was just to scare the person who he thought was breaking into his home with a warning shot into the air. Again, defendant claimed that the gun discharged accidentally, but this time he said that it was because he was unbalanced. Defendant claimed that this imbalance caused his finger to slip from the trigger guard to the trigger, and the momentum from this slip caused his finger to actually pull the trigger. A deputy inspected defendant's gun and concluded that it did not have a "hair trigger," meaning that the trigger was not particularly sensitive. While defendant's conflicting statements alone tend to show his consciousness of guilt, it is also notable that none of his accounts of the events were supported by the video evidence. Defendant admitted as much at trial.

Furthermore, although motive is not an element of AWIGBH, evidence of motive is relevant in determining whether a defendant acted with the intent to kill or to do great bodily harm. See *id*. at 223. Both defendant and his wife testified regarding a history of break-ins and attempted home invasions. Although, they embellished the number and nature of the alleged prior incidences, it was undisputed that their home had been breached on several occasions. This is actually what prompted defendant to secure the home with an alarm system and surveillance cameras. The complainant testified that when defendant came down the stairs, he appeared angry. Defendant admitted that when he came down the stairs, he was thinking to himself, "Oh, hell no, not again." When the detective confronted defendant with the surveillance video and the implausibility of defendant's version of the events, defendant replied, "I'm tired of being a victim." From this evidence, the jury could have inferred that defendant intended to shoot the complainant because he was motivated by not only safety concerns, but also an ill-conceived sense of righteous indignation.

In sum, the jury was presented with both parties' interpretations of the events, and it was up to the jury to determine which theory was more plausible. The jury also had the benefit of the video evidence, and it was entitled to find that this evidence supported the complainant's credibility. This Court will not interfere with the jury's role in determining the weight of the evidence or the credibility of witnesses. *People v Muhammad,* 326 Mich App 40, 60; 931 NW2d 20 (2018). Accordingly, we reject defendant's argument that the evidence was insufficient to support his conviction of AWIGBH.

## V. ADJOURNMENT

Next, defendant argues that the trial court abused its discretion when it denied his "request" for an adjournment before trial. To preserve an issue regarding the denial of an adjournment, a defendant must actually request an adjournment or a continuance. *People v Snider,* 239 Mich App 393, 421; 608 NW2d 502 (2000). Contrary to what defendant asserts, the record discloses that he never requested an adjournment of trial. Therefore, this issue is unpreserved. This Court reviews unpreserved issues for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

Defendant's argument is three-fold. Not only does he argue that he was denied an adjournment, he asserts that the trial court's denial of his "request" prevented him from calling his treating medical professionals, which in turn deprived him of the opportunity to present a defense. However, defendant never actually requested an adjournment and, during trial, he never sought to call the proposed witnesses in his defense. Due to these failures, defendant's argument lacks merit.

MCR 2.503(B)(1) provides, in relevant part, that "[u]nless the court allows otherwise, a request for an adjournment must be by motion or stipulation made in writing or orally in open court based on good cause." "A motion for adjournment must be based on good cause." *People v Coy*, 258 Mich App 1, 18; 669 NW2d 831 (2003). See MCL 768.2. "Good cause" factors include "whether defendant (1) asserted a constitutional right, (2) had a legitimate reason for asserting the right, (3) had been negligent, and (4) had requested previous adjournments." *Coy*, 258 Mich App at 18 (quotation marks and citation omitted). Application of these principles is difficult in this case because defendant never requested an adjournment.

The trial court issued an order on August 28, 2018 requiring the parties to file their witness list at least one week before trial. On September 10, 2018, the prosecution requested that defendant identify the witnesses he intended to call at trial and, among other things, provide a copy of any expert witness's curriculum vitae (CV) and a description of the substance of the witness's proposed testimony. On September 14, 2018, defendant filed a witness list that identified three of defendant's treating doctors, but defendant did not provide a CV or the substance of the witnesses' proposed testimony. This prompted the prosecution to file a motion to strike these witnesses or, in the alternative, to compel defendant to provide an offer of proof to determine the admissibility and relevancy of the anticipated testimony. In response to the prosecution's motion, defendant represented that it was necessary to call his treating physicians and therapist to determine what medications defendant was taking and whether they could have affected his state of mind. Defendant wished to call his therapist to explain what it means to be diagnosed with post-traumatic stress disorder (PTSD) and what the signs and symptoms are of someone with PTSD.

At the motion hearing, the prosecution argued that diminished capacity precipitated by the use of medication was not a recognized defense in Michigan and, therefore, the proposed testimony of the medical professionals was not relevant. Defendant argued that the proposed testimony was relevant because his emotional or mental impairments could constitute mitigating circumstances. The prosecution asserted that it would be entitled to discovery related to defendant's medical and emotional conditions to determine if it was necessary to call its own expert, in response to which the court noted that the case was scheduled for trial in less than a week. Defense counsel then stated, "I understand judge, but, however, if—depending on how the Court rules, I would potentially ask for an adjournment." The court indicated that it would take the matter under advisement and issue a written opinion. In the written order that followed, the court granted in part and denied in part the prosecution's motion, stating in relevant part, "The motion to strike the witnesses is denied. The admissibility of the evidence will be addressed at trial, at which time Defendant will be required to provide an offer of proof regarding the evidence at issue."

When trial began, the court briefly revisited the prosecution's motion to strike defendant's witnesses and explained that the issue would be addressed later, outside the jury's presence. Later, in reference to the number of witnesses who would be called, defense counsel stated that "[i]t will also depend on the Court's ruling as far as any other evidence from the Defense coming in as far as any other witnesses." In response, the court indicated that it had been contemplating the issues and noted that there would have to be a foundation for defendant to call the medical witnesses. Defense counsel indicated that he understood, but the prosecutor again objected to the proposed witnesses. The court reiterated that it wanted to consider the additional evidence to determine if there existed any foundation for the testimony, explaining, "I can't have a doctor testifying about medications unless I have a witness saying I took them, and the time that they were taken." The court indicated that a similar foundation would have to be established for the testimony of the therapist.

After defendant presented the testimony of his wife, the court asked defense counsel how many more witnesses defendant intended to call. At that point, counsel indicated that he only intended to call one more witness: defendant. Then, after defendant's testimony, the court held a brief bench conference, after which it indicted that defendant was the last witness, and closing arguments would be heard in the morning. The following morning, defendant indicated that he had no more witnesses and the defense rested.

As should be clear from the above summary, defendant never sought an adjournment or a continuance. In the absence of a ruling by the trial court, this Court has nothing to review. *People v Buie,* 491 Mich 294, 311; 817 NW2d 33 (2012). "[I]n the absence of a request for a continuance, a trial court should assume that a party does not desire a continuance." *People v Elston*, 462 Mich 751, 764; 614 NW2d 595 (2000).

Moreover, defendant does not present any argument or legal citation to explain how an adjournment would have altered the result or outcome of the trial. Defendant represents that trial counsel sought an adjournment because the prosecution was seeking to strike his medical witnesses who would testify regarding defendant's PTSD. However, the court denied the prosecution's pretrial motion to strike the witnesses. Then, during trial, the court never denied a request to call the proposed witnesses. Instead, the defense rested its case without any indication that it still wished to call the medical witnesses. "By failing to call an expert witness, despite the trial court's

-10-

indication that it would consider defendant's ability to do so after defendant established a basis for that testimony, defendant waived his claim that he was denied the opportunity to present a defense." *In re Propp*, ___ Mich App ___, ___; ___NW2d___ (2019) (Docket No. 343255).

Accordingly, defendant has failed to demonstrate a plain error affecting his substantial rights.

## VI. SCORING OF OV 1

Defendant argues that the trial court erred in its scoring of offense variable (OV) 1 of the sentencing guidelines. We disagree.

When reviewing a trial court's scoring decision, the court's findings of fact are reviewed for clear error and must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). The Court reviews de novo the trial court's determination whether the facts as found satisfy the scoring conditions articulated in the statute. *Id*.

The court assessed 25 points for OV 1, involving the "aggravated use of weapon." An assessment of 25 points is appropriate if "[a] firearm was discharged at or toward a human being or a victim was cut or stabbed with a knife or other cutting or stabbing weapon[.]" MCL 777.31(1)(a). Defendant argues that OV 1 should have been scored at only 15 points, which is the appropriate score when "[a] firearm was pointed at or toward a victim or the victim had a reasonable apprehension of an immediate battery when threatened with a knife or other cutting or stabbing weapon." MCL 777.31(1)(c). Thus, defendant concedes that the evidence was sufficient to establish that he pointed a gun at or toward the complainant, but argues that it was insufficient to establish that the weapon was discharged at the complainant. We disagree.

As discussed earlier, there was ample evidence that defendant pointed the gun at the complainant and then fired. This is borne out by both the complainant's testimony and the surveillance video. At trial, the complainant testified that as he fled, he looked back and saw defendant pointing a gun at him. This compelled the complainant to run faster. The complainant then heard a shot fired. Given that the gun was fired after the complainant saw defendant pointing the gun at him and the complainant perceived a need to run to avoid the gunfire, the evidence supports the trial court's assessment of 25 points for OV 1. The surveillance video evidence further strengthens this conclusion. The video depicts defendant leveling the shotgun, aiming the gun in the complainant's direction, trying to pull the trigger, taking the safety off, and then firing. An inference may be drawn that defendant discharged the gun in the complainant's direction. Accordingly, the trial court did not err when it assessed 25 points for OV 1.

## VII. DEPARTURE SENTENCE

Defendant's sentencing guidelines minimum sentence range was calculated at 0 to 17 months. The trial court sentenced defendant to 2 to 10 years' imprisonment, which represents a seven-month upward departure. Defendant does not challenge the reasonableness of the court's departure sentence, but asserts that the court failed to articulate its reasons for the sentence imposed. We agree.

-11-

A sentence imposed by the trial court must be proportionate to the seriousness of the circumstances surrounding both the offense and the offender. *People v Milbourn,* 435 Mich 630, 636; 461 NW2d 1 (1990). The sentencing guidelines "remain a highly relevant consideration in a trial court's exercise of sentencing discretion . . . that the trial court must consult and take into account when sentencing." *People v Lockridge,* 498 Mich 358, 391; 870 NW2d 502 (2015) (quotation marks and citations omitted). Trial courts may depart from the sentencing guidelines "when in their judgment, the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime." *Milbourn,* 435 Mich at 657. "A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *Lockridge,* 498 Mich at 392. "[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is an abuse of discretion." *People v Dixon-Bey,* 321 Mich App 490, 520; 909 NW2d 458 (2017). Accordingly, the pertinent inquiry for appellate courts reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the principle of proportionality. *Id.*

Of import to this appeal, this Court in *Dixon-Bey* emphasized that "a trial court must justify a sentence imposed in order to facilitate appellate review." *Id.* at 525 (quotation marks and citations omitted). This requires that the sentencing court provide "an explanation of why the sentence imposed is more proportionate to the offense and offender than a different sentence would have been." *Id.* (quotation marks and citations omitted).

In this case, the trial court did not adequately explain why its departure sentence of 2 to 10 years was more proportionate than a different sentence would have been. After the court articulated defendant's sentence, defendant objected to the upward departure. In response, the trial court simply replied, "The guidelines are advisory, and based on the circumstances of the case, the Court feels that they're appropriate." The court's comments do not provide a sufficient explanation to facilitate appellate review. Earlier, the court did make certain observations, but those were primarily directed at reciting the general facts of the case; they provide little guidance for determining why the court imposed an out-of-guidelines sentence. The court stated:

> Okay, All right, the Court has reviewed the pre-sentence report and the many letters that were submitted, and the sentencing memorandum. You have one prior misdemeanor for discharge of a weapon without malice or injury in 2004 stemming from a road rage incident.
>
> In my case, the jury found you guilty of a lesser included offense, and felony firearm. You're married with three children, living in Rochester Hills, employed as firefighter in Detroit from 1989 to 2013, achieving the rank of lieutenant. You left because of the physical requirement of the job, and you receive a pension. You have some college credits. You drink daily. You have physical problems, including hip replacements and neck injuries. You were diagnosed with PTSD in 2010, began treatment while on bond in my case.
>
> This offense occurred in Rochester Hills. The victim was 14, and after oversleeping and walking to school, he approached your home for directions. Your wife began screaming, thinking a break-in was occurring. You ran down the stairs, you grabbed your shotgun. You exited your home, and went onto our porch. You

pointed the gun at the victim, . . . but the safety was on. You released the safety, and then shot in the direction of the victim, who, fortunately, had the time to flee.

The victim has become fragile, and is enrolled in therapy, and prescribed medication. Shooting at a teenager, leaving your premises has consequences. Fortunately, no physical injury occurred.

Firemen are held in very high esteem for the service they perform. Even right now, with considering California and the fires. Your actions weren't in conformity with the actions of those brave firefighters.

When imposing a departure sentence, the trial court must explain why the sentence imposed is more proportionate than a different sentence would have been in order to facilitate appellate review of the defendant's sentence. *People v Smith,* 482 Mich 292, 304; 754 NW2d 284 (2008). Although the court referenced many of the facts of the case, it did not explain why a seven-month departure is more proportionate than a different sentence would have been, nor did it explain why the extent of the departure was appropriate. "A sentence cannot be upheld when the connection between the reasons given for departure and the extent of the departure is unclear." *Id.* Because the trial court did not comport with the foregoing principles, we remand this case for the trial court to either articulate its reasons for departing from the sentencing guidelines or resentence defendant.[3]

We affirm defendant's convictions, but remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Colleen A. O'Brien
/s/ James Robert Redford

---

[3] On appeal, the prosecution does not reference anything that the trial court stated at sentencing, and instead encourages us to affirm defendant's sentence for reasons given by the prosecution at trial. Doing so, however, would be inappropriate because, in general, "an appellate court should avoid supplementing or otherwise justifying the trial court's otherwise insufficient reasoning with reasoning of its own." *Dixon-Bey*, 321 Mich App at 531, citing *Smith*, 482 Mich at 304. The appropriate remedy is to allow the trial court the opportunity to explain its sentence in the first instance.